# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

CARY WEISS,

        Plaintiff,

v.                                    Case No. 13-C-584

AER SERVICES, INC.,

        Defendant.

## ORDER GRANTING [14] DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Cary Weiss brought this action against defendant AER Services, Inc., alleging that AER terminated him because he blew the whistle on AER's fraudulent practice of employing Israeli *Shochets*, or Jewish ritual slaughterers, through the government's R-1 visa program. Weiss asserted claims under the anti-retaliation provision of the False Claims Act (FCA), 31 U.S.C. § 3730(h), and the Wisconsin common law tort of wrongful discharge. (Compl. ¶¶ 33–38, ECF No. 1.) AER filed a counterclaim for abuse of process against Weiss, asserting that he commenced this action for the ulterior purpose of seeking retribution against AER because AER refused to pay "hush money" to prevent him from disclosing information in an unrelated class action suit. (Countercl. ¶¶ 1–13, ECF No. 6.) On May 1, 2014, AER moved for summary judgment on Weiss's claims. (ECF No. 14.) Though AER's motion does not comply with the local rules of the district, the Court nevertheless concludes that it should be granted for the reasons set forth below.

### I. Background

AER contracts with ConAgra Foods, Inc.'s brand Hebrew National to provide kosher meat processing and inspection services at six plants in the upper Midwest: Gibbon, Nebraska; St. Paul,

Minnesota; Long Prairie, Minnesota; Windom, Minnesota; and two facilities in Green Bay, Wisconsin. (Pl's Proposed Findings of Fact (PPFOF) ¶ 2, ECF No. 19; Def's Mem. in Supp of Summ. J. (Def's Mem.) at 3, ECF No. 15.) Although Weiss was born in the United States, for 25 years he lived in Jerusalem, Israel, where he studied the laws of kosher in a yeshiva. (Weiss Dep. at 14:21–15:6, 94:7, 95:13–15, ECF No. 15-2.) AER employed Weiss as a *Shochet* during the periods of 2007–2009 and March 2011–June 5, 2012. (Def's Mem. at 3–4.) He worked at several of AER's facilities and engaged in the ritual slaughter of animals for meat throughout his employment. (PPFOF ¶ 3.) As a *Shochet*, Weiss was required to observe and comply with certain religious qualifications, processes, and directives. (Def's Mem. at 4.) AER's kosher certification authority was Triangle K, an entity led by chief rabbinical coordinator Rabbi Ralbag. (*Id.* at 5.) AER terminated Weiss's employment in 2009 after Rabbi Ralbag determined that Weiss was morally unfit to perform the essential functions of his job. (*Id.*)

Upon Rabbi Ralbag's approval, AER re-hired Weiss in March 2011 under a "Substitute/Stand-In" employment contract. (*Id.*; ECF No. 15-4.) The contract provided that Weiss's "duties, responsibilities, reporting relationships to [his] supervisors and the location of [his] employment may be changed by [AER] from time to time." (ECF No. 15-4.) On June 5, 2012, Rabbi Moshe Fyzakov, AER's Vice President of Operations, terminated Weiss's employment after he failed to comply with Fyzakov's directive to transfer from a Green Bay facility to the Windom, Minnesota facility. (Def's Mem. at 5; Termination Letter, Heins Decl. Ex. B, ECF No. 23.)

Weiss contends that his termination was pretextual and that AER actually terminated his employment in retaliation for his whistleblowing activities. Weiss claims he discovered sometime around 2007 that AER had developed a fraudulent scheme to acquire temporary nonimmigrant

religious workers, or R-1 visa workers, from Israel. According to the U.S. Citizenship and Immigration Services (USCIS), "[a]n R-1 is a foreign national who is coming to the United States temporarily to be employed at least part time . . . by a non-profit religious organization in the United States (or an organization which is affiliated with the religious denomination in the United States) to work as a minister or in a religious vocation or occupation." *R-1 Temporary Nonimmigrant Religious Workers*, U.S. CITIZENSHIP AND IMMIGRATION SERVICES, http://www.uscis.gov/working-united-states/temporary-workers/r-1-temporary-religious-workers/r-1-temporary-nonimmigrant-religious-workers (last visited July 15, 2014). Sponsoring organizations must provide proof of tax-exempt status. *Id.* Weiss believes AER desired to use R-1 workers rather than U.S. citizens because they provide cheaper labor, do not speak English, and are generally more vulnerable and subject to an employer's control. (PPFOF ¶ 32.)

Weiss asserts that an unidentified friend gave him a copy of his visa application in or around 2007, and the application identified the visa petitioner as the Ravenswood Budlong Congregation (hereinafter the "Ravenswood Congregation"). (*Id.* ¶ 10.) The application stated that the Ravenswood Congregation was founded in 1955 in the Ravenswood Budlong area of Chicago and "has grown to become one of the most highly regarded Jewish congregations in the area." (Puklich Ex. B, ECF No. 15-2.) In describing the need for religious workers, the application stated:

> The relationship between [the Ravenswood Congregation] and kosher food providers is of great importance to the local Jewish community . . . . Ravenswood maintains its religious and social duty by obtaining qualified Religious workers for the purpose of enabling the performance of kosher harvests, hence making sure the Jewish community is provided with kosher food that is properly blessed and prepared by the standards of the religion.

(*Id.*) Weiss became suspicious because he grew up in Chicago and believed that the Ravenswood neighborhood's Jewish population had emigrated to other areas. (Weiss Dep. at 17:2–14.) Weiss

drove to Chicago to investigate an address on Foster Avenue where he believed Ravenswood should have been located. (*Id.* at 22:19–24:21.) When he arrived, he found an empty lot and claims he was told by surrounding store owners that the building formerly identified with the Ravenswood Congregation had been torn down for four years. (*Id.* at 25:16–24.) Weiss concluded that AER was using the Ravenswood Congregation, a defunct entity, to fraudulently petition the government for R-1 visa workers. He believed it was fraudulent to describe an empty lot as a flourishing synagogue, and he testified that while he was working for AER, all the meat produced "didn't go to any Ravenswood Congregation and it didn't go to the people of Chicago, either." (Weiss Dep. 34:25–35:4.) Weiss asserts that AER perpetuated the fraud by "grafting" the name of the Ravenswood Congregation onto workers' dormitories in Wisconsin, Minnesota, and Nebraska, and onto Jewish Salvation Army Centers, also known as Chabad centers. (PPFOF ¶¶ 17–18; Weiss Dep. at 36:3–37:19.) Weiss contends that these signs are intended to "give life to the existence of a lie." (PPFOF ¶ 17.)

Weiss testifies that in approximately 2008–2009, he began reporting his belief in AER's fraud to the U.S. Division of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) office in Oakbrook Terrace, Illinois. (PPFOF ¶ 26.) He claims he then served as a confidential informant for ICE and worked with agent Nolan Craft to investigate AER's fraudulent conduct. (*Id.* ¶ 28.) Weiss also claims that he sent packets of information regarding his belief in AER's fraud to United States Secretary of Homeland Security Janet Napolitano, the United States Department of Homeland Security Office of Inspector General, the USCIS office in Washington, D.C., the USCIS office in Milwaukee, Wisconsin, the Federal Bureau of Investigation (FBI), the U.S. Department of State, and Wisconsin Congressman Reid Ribble. (PPFOF ¶ 30; Weiss Dep. at

114–23.) Weiss further claims that as a result of his whistleblowing activities, the State Department and the U.S. embassy in Tel Aviv, Israel stopped granting R-1 visas to the Ravenswood Congregation. He contends that some of his friends and former co-workers were stranded in Israel, questioned about the existence of the Ravenswood Congregation, and prevented from returning to the United States to work for AER. (PPFOF ¶¶ 34–36.) Robert Helfant, one of AER's Kosher Meat Supervisors, also asserts that AER has recently suffered a labor shortage, and he attributes that shortage to Weiss's reports. (Helfant Decl. ¶ 20, ECF No. 23.)

Weiss posits that in retribution for his whistleblowing activities, AER set him up to be fired by ordering an unreasonable transfer. On Friday, June 1, 2012, Josef Ben-Zaken, Weiss's supervisor, ordered him to report to Windom, Minnesota to work at 6:00 a.m. on the morning of Monday, June 4, 2012. (PPFOF ¶ 42.) Although Weiss acknowledges that AER employees were subject to transfer at any time, he contends this was an unprecedented transfer because of the long travel distance and short period of time involved. (PPFOF ¶¶ 8, 50.) He asserts that Windom is located approximately 500 miles from Green Bay and that the drive takes eight or nine hours. (*Id.* ¶ 43; Weiss Dep. at 151:1–3.) Weiss states that because he would be preparing for and observing the Sabbath until Saturday evening, he only had Saturday evening to Sunday morning to prepare to relocate. (PPFOF ¶ 44.) He claims that it was impossible for him to move on such short notice because he owned property and needed to make arrangements for his tenants and also required special food and cookware preparation for his vegan diet. (*Id.* ¶ 47.) Weiss claims he called Rabbi Fyzakov and left a message asserting that the transfer was unreasonable but offered to show up in Minnesota on Tuesday, June 5 instead. (*Id.* ¶ 45.) He did not show up to work in Minnesota on June 4 or 5, and he subsequently received a termination letter. (*Id.* ¶ 53; Termination Letter, Heins

Decl. Ex. B, ECF No. 23.)

AER asserts that Weiss's claims are baseless speculation and that the premise of his complaint, that the Ravenswood Congregation does not exist, is demonstrably false. Rabbi Yosef Moscowitz asserts that he is the President of the Ravenswood Congregation, an Illinois Not-for-Profit Company, which is currently located at 1630 and 1632 N. Milwaukee Avenue, Chicago, Illinois. (Moscowitz Decl. ¶ 1, ECF No. 15-5.) He states that the Ravenswood Congregation was incorporated under the laws of the State of Illinois on October 21, 2004 and has provided documentation showing that it was approved for federal tax exempt 501(c)(3) status from the Internal Revenue Service in December 2004. (*Id.* ¶¶ 2–3; Moscowitz Ex. A, ECF No. 15-6.) He has also provided a screenshot taken from the Illinois Secretary of State's website which he submits indicates that the Ravenswood Congregation is a Not-for-Profit entity in good standing with the state of Illinois. (Moscowitz Ex. B, ECF No. 15-6.) Rabbi Moscowitz asserts that the Ravenswood Congregation has approximately 300 members and that it has changed location several times. (Moscowitz Decl. ¶¶ 5–13.) He explains that upon incorporation, the Ravenswood Congregation was located at 2832 W. Foster Avenue, but on or about September 2007, it vacated that location and moved to 2701 W. Foster Avenue, which was a field house of the Budlong Elementary School. (*Id.* ¶¶ 7–8.) On or about February 2010, the Ravenswood Congregation purchased the building located at 1630 N. Milwaukee Avenue and moved into the property approximately one year later. (*Id.* ¶¶ 9–12.) Rabbi Moscowitz asserts that "Ravenswood is, and has from the date of its incorporation been an active congregation that operates in full compliance with all applicable Jewish laws," and further, that it "has, and continues to, serve the needs of the Jewish community." (*Id.* ¶ 14.) Finally, Rabbi Moscowitz asserts that Weiss never contacted him to discuss any concerns regarding

the Ravenswood Congregation. (*Id.* ¶ 15.)

Rabbi Fyzakov also asserts that Weiss misunderstands AER's operations. (Fyzakov Decl. ¶ 6, ECF No. 15-3.) He states that AER, a for-profit entity, only employs qualified American citizens and that the workers possessing R-1 visas are employed solely by the Ravenswood Congregation, a non-profit entity. He asserts that AER does not own any part of Ravenswood and Ravenswood does not own any part of AER. (*Id.* ¶ 7.) Finally, Rabbi Fyzakov asserts that he ordered Weiss's transfer on June 1, 2014, solely because of company need and that Weiss was only terminated because he failed to show up for work in Minnesota or speak with him to make alternative arrangements. (*Id.* ¶ 11.) Rabbi Fyzakov denies that he received a voicemail from Weiss on June 1, 2012. (*Id.* ¶ 10.)

## II. Summary Judgment Methodology

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "An affidavit or declaration used to support or oppose a motion must be based on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Visser v. Packer Eng'g Assocs, Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (observing that "personal knowledge" may include factual inferences and opinions, so long as the inferences and opinions are "grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that experience."). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago,* 119 F.3d

1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party has the burden of showing there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In determining whether summary judgment is proper, a court must construe the evidence in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. There is no genuine issue of material fact, and therefore no reason to go to trial, when no reasonable jury could find in the non-moving party's favor. *Smith v. Lafayette Bank & Trust Co.,* 674 F.3d 655, 657 (7th Cir. 2012).

### III. Analysis

The FCA makes it unlawful for a person to "knowingly present[ ], or cause[ ] to be presented, a false or fraudulent claim for payment or approval" to the United States government. *United States v. King-Vassel*, 728 F.3d 707, 711 (7th Cir. 2013) (quoting 31 U.S.C. § 3729(a)(1)(A)). An individual may bring a *qui tam* suit against the alleged fraudsters on behalf of the United States and may recover civil damages. *Id.* The FCA also prohibits an employer from discharging an employee "because of lawful acts done . . . in furtherance of an [FCA action]" or for "efforts to stop 1 or more [FCA] violations." 31 U.S.C. § 3730(h). A plaintiff may proceed under subsection (h) independently of a *qui tam* action. *Neal v. Honeywell Inc.*, 33 F.3d 860, 865 (7th Cir. 1994). To recover under subsection (h), a plaintiff must demonstrate that (1) his actions were taken "in furtherance" of an FCA enforcement action and were therefore protected by the statute; (2) his employer had knowledge that he was engaged in this protected conduct; and (3) his discharge was motivated, at least in part, by the protected conduct. *Fanslow v. Chicago Mfg. Ctr.,*

*Inc.*, 384 F.3d 469, 479 (7th Cir. 2004). Weiss's claim fails on the first prong.

The protected activity prong has a subjective and an objective component: an employee's actions are protected under the statute if "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* at 480. AER contends that Weiss's beliefs about Ravenswood are objectively unreasonable and based on nothing more than speculation. The Seventh Circuit has explained that § 3730(h)

> limits coverage to situations in which litigation could be filed legitimately—that is, consistently with Fed. R. Civ. P. 11. Then an employee who fabricates a tale of fraud to extract concessions from the employer, or who just imagines fraud but lacks proof, legitimately may be sacked. No action is "to be filed" in either case, and employees who use reports of fraud to better their own position, or who behave like Chicken Little, impose costs on employers without advancing any of the goals of the False Claims Act.

*Lang v. Nw. Univ.*, 472 F.3d 493, 494–95 (7th Cir. 2006) (quoting *Neal*, 33 F.3d at 864). Federal Rule of Civil Procedure 11 authorizes courts to impose sanctions on an attorney or party for filing frivolous or improper claims. Relevant here, Fed. R. Civ. P. 11(b)(3) requires that a party's "factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." *See Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (observing that under Fed. R. Civ. P. 11(b)(3), a plaintiff must conduct a preliminary investigation of the relevant facts and law before bringing suit).

In *Lang*, an employee of the Northwestern Medical Faculty Foundation called the FBI to report that executives of the Foundation were lying to the Federal Reserve in order to obtain a "gold bond rating" plus a federal loan on easy terms. 472 F.3d at 494. Lang's theory was based on an article in *Crain's Chicago Business* which reported that the Foundation was burdened by debt and

was fueled by office gossip. *Id.* Neither Lang nor anyone who passed the gossip on to her knew about any concrete false statement made to any federal entity. *Id.* Lang was terminated for speaking to the FBI, and she subsequently brought suit under § 3730(h). *Id.* The Seventh Circuit affirmed the district court's ruling that Lang lacked objective basis for her belief because the *Crain's* article did not hint at fraud, Lang had no access to any of the Foundation's financial records, and the belief itself was fantastic—if Lang had further investigated the matter before contacting the FBI, she would have discovered that the Federal Reserve does not rate bonds or extend credit to private foundations. *Id.* at 495. The court emphasized that allegations of fraud cause considerable trouble and expense for a company and concluded that Lang's belief was too fantastic to warrant protection under § 3730(h). *Id.*

Weiss's claim suffers from similar flaws. Weiss states that he initially became suspicious about the Ravenswood Congregation when an unidentified friend gave him a copy of his R-1 visa application. (Puklich Ex. C, ECF No. 15-2.) Weiss's friend's name is redacted on the application. (*Id.*) As noted above, the application states that the Ravenswood Congregation "has grown to become one of the most highly regarded Jewish congregations in the area," and explains the Congregation's motivation for seeking R-1 visa workers. (*Id.*) The application also states that the Ravenswood Congregation was founded in 1955 in the Ravenswood Budlong area of Chicago and references the following exhibits:

> Ex A:  Ravenswood Budlong Congregation Articles of Incorporation, Letter from Corporate Counsel Evidencing Application for Federal Tax Exempt Status, & IRS Acknowledgment of Filing
>
> Ex. B: Illinois Department of Revenue Tax Exemption Document & Number
>
> Ex. C: Recent and Historical Event Paraphernalia regarding Congregation

> Ex. E: Contract agreement between Ravenswood and AER, Services, Inc. for assignment of religious workers
>
> Ex. F: Information regarding AER, Services, Inc.
>
> Ex. G: [Applicant's] Religious Slaughter Degree
>
> Ex. H: [Applicant's] Resume
>
> Ex. I: Employment Contract [partially illegible]

(*Id.*) (Ex. D omitted in original). This is the only visa application Weiss has offered as evidence, and it forms the basis of many of his allegations. The application itself, however, does not hint of fraud and it does not support Weiss's broad-sweeping conclusions. The application is undated, and Weiss admits that he does not know when it was created or submitted to the government. (Weiss Dep. at 88:22–92:18.) The application also does not provide an address for the Ravenswood Congregation, and thus, it is unclear why Weiss expected to find the Ravenswood Congregation at the location of the empty lot on Foster Avenue. Although one may speculate that Weiss saw an address on one of the exhibits (which are not in the record), it does not appear that Weiss ever possessed or reviewed the exhibits. Weiss denies having reviewed Exhibits A through I listed above. (Weiss Dep. at 99:8–102:4.)

Where information was lacking, it appears that Weiss filled the void with his own speculation. For example, Weiss proposes as fact that "[t]he vast majority of [AER's] employees were on R-1 work visas from Israel that were granted by the U.S. Embassy in Tel Aviv, Israel and petitioned for by a synagogue allegedly located in the Ravenswood neighborhood of Chicago, the Ravenswood Budlong Congregation, located at 2701 West Foster Avenue, Chicago, Illinois 60625." (PPFOF ¶ 9.) Weiss supports this fact solely by citing an identical allegation in ¶ 9 of his complaint. At this stage of the litigation, however, bare allegations unsupported by evidence do

not suffice. *See Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010) (explaining that summary judgment is the "put up or shut up" moment in litigation). Similarly, Weiss proposes as fact that "[o]n some of [AER's] R-1 standard visa petitions, which have been used for a lengthy amount of time, [AER] deceptively describes the Ravenswood Budlong Congregation (which they used as a front to request workers for their business) as a large, flourishing, active synagogue." (PPFOF ¶ 11.) Weiss again cites his complaint, and he also cites his friend's application—but that application says nothing about the size of the Ravenswood Congregation, and it does not establish what has been included in other petitions. (Puklich Ex. C, ECF No. 15-2.) In short, Weiss stretches the application far beyond what it actually says. Weiss has failed to provide evidence from which a jury could infer that it was reasonable for him to drive to a particular location on Foster Avenue and expect to find a "large" and "flourishing" Ravenswood Congregation—or any congregation at all.

Despite Weiss's apparent lack of information, he asserts that his suspicions were confirmed when surrounding store owners told him that the structure formerly identified with the Ravenswood Congregation had been torn down four years earlier. (Weiss Dep. at 25:16–24.) But even if the store owners in fact said this, a quick leap to allegations of fraud would have been inappropriate, on par with the plaintiff's inferential leap in *Lang*. Under Rule 11, a court would expect an individual in Weiss's position to investigate whether the Ravenswood Congregation had ceased to exist or had simply relocated before levying accusations of fraud. Weiss contends that he did eventually investigate the 1630 N. Milwaukee Avenue location, but this investigation was minimal. Weiss asserts that he visited the Milwaukee Avenue site on "two or three" occasions but that the door was locked each time he attempted to visit. (*Id.* at 38:9–12.) However, he does not describe

the circumstances of his visits or explain why he should have expected the door to be open at the times he visited. A locked door, without any further context, is insufficient to support an allegation of fraud. Weiss admits that to the present day, he has not stepped foot inside 1630 N. Milwaukee Avenue, even though he acknowledges that other Jews from the community enter for prayer in the chapel. (*Id.* at 52:9–53:20.) Additionally, despite acknowledging that Rabbi Joseph Moscowitz is identified as the rabbi of the Ravenswood Congregation, Weiss admits that he has never spoken with Rabbi Moscowitz. (*Id.* at 27:17.)

The rest of Weiss's allegations are similarly unsupported by evidence. Weiss asserts that "the biggest proof that Ravenswood does not exist" comes from AER advertising the Ravenswood Congregation and the Chabad Center together on the internet. (Puklich Ex. D, ECF No. 15-2 (advertising "Bucktown Wicker Park Chabad Jewish Center and the Ravenswood Budlong Congregation" located at 1630 N. Milwaukee Avenue); Puklich Ex. E, ECF No. 15-2.) Although Weiss alleges that AER made the internet ads, AER is not referenced in the ads and Weiss has offered no other evidence to support this allegation. (Weiss Dep. at 43:16–23.) Weiss claims that in the contract agreement between the Ravenswood Congregation and AER (Ex. E in his friend's application), the Ravenswood Congregation is falsely portrayed as the kosher certifier (PPFOF ¶ 15), but Weiss has not even provided a copy of the contract. Weiss also claims that none of the meat produced by AER goes to the Ravenswood Congregation or even the city of Chicago (PPFOF ¶ 16), but he has not substantiated this claim with evidence. Additionally, despite never having been inside the 1630 N. Milwaukee Avenue building himself, Weiss testifies that other employees told him that the Milwaukee Avenue site was just a Chabad House and not home to a Ravenswood Congregation. At first he declined to give the names of the other employees, but then he stated that

he did not remember any specific person with whom he spoke. (Weiss Dep. at 38:20–42:7.) Weiss's vague account of what he heard from unspecified AER workers is no more reliable than the gossip relied upon by the plaintiff in *Lang*, and it does not help establish that he had personal knowledge of facts that would reasonably raise suspicion of fraud.

In sum, a reasonable jury could not find that Weiss suspicions of fraud were objectively reasonable. Weiss's summary judgment materials contain mostly unsupported allegations and other hearsay statements that are not treated as facts for purposes of summary judgment. Like the plaintiff in *Lang*, Weiss has not shown that his theory of fraud was based on anything more than speculation and gossip. Weiss's FCA retaliation claim therefore fails as a matter of law and his claim will be dismissed. Weiss's wrongful discharge claim will also be dismissed because Weiss has abandoned the claim. (Pl's Br. in Opp. at 13–14, ECF No. 21.)

## IV. Conclusion

For the foregoing reasons, AER's motion for summary judgment (ECF No. 14) is granted, and Weiss's claims against AER will be dismissed with prejudice. AER's claim for abuse of process against Weiss remains for trial.

**SO ORDERED** this   5th   day of August, 2014.

                                                                s/ William C. Griesbach
                                                                William C. Griesbach, Chief Judge
                                                                United States District Court